Bronson, J.
dissenting. There are some points in the case upon which I am unable to concur with my brethren.
If the New-York street law could be regarded as enlarging our jurisdiction, by conferring new judicial powers to be exercised as a court, then I 'agree that the statute would be free from constitutional objection; But it has been long settled that the powers conferred by this, and other laws of the-same general *27 nature, are not strictly judicial; and that in carrying them into execution we do not act as a court, but as commissioners appointed by the legislature. (Stafford v. Mayor of Albany, 7 John. 541; Matter of Beekman street, 20 id. 269; Matter of Mayor of New- York, 6 Cowen, 571; Matter of Mount Morris Square, 2 Hill, 14.) Acting on this principle we have uniformly refused to set aside the proceedings in street cases under any circumstances—holding that while sitting as commissioners we had no power to recall that which had once been done. And when the parties have desired a review in a street case, the "supreme court has issued a certiorari to the justices of that court as commissioners; and after having thus got the matter before us as a court, and affirmed what had previously been done in another character, a writ of error has been brought in the court of errors. (See Livingston v. Mayor of New- York, 8 Wend. 85; Patchin v. Mayor of Brooklyn, 13 id. 664.) In ffiese and all the other forms in which the question has arisen, if has been uniformly held that in executing the street law of 1813 we act as commissioners appointed by the legislature, and not as a court. The same doctrine hag been laid down by the federal judiciary. By an act of congress passed in 1792 (2 Bio. 259) the circuit courts of the United States were directed to inquire into and decide upon the claims of certain persons to be placed upon the pension list. Several of those courts declined to execute the law, on the ground that the duties assigned to them were not of a judicial nature. The circuit court for the district of New-York, with Chief Justice Jay at its head, held that the act of congress could only b.e considered as appointing commissioners for the purposes mentioned in it, by official instead of personal description: that the judges regarded themselves as being the commissioners designated by the act, and therefore as being at liberty to accept or decline that office. As the object was a benevolent one, and the judges wished to manifest their respect for the legislature, they accepted the trust. (Note to Hayburn's case, 2 Dall. 410.) The justices of this court seem to have acted on the same principle when they accepted the office of street commissioners under the New-York law. (Matter *28 of Beekman street, 20 Johns. 269.) But the constitutional inhibition against holding any other office, which was substantially the same then as it is now, was entirely overlooked. [Const. of 1777, art. 25; Const. of 1821, art. 5, § 7.) Since an appeal has been made to the fundamental law, it is no longer the mere question whether we will consent to accept the office, and execute the statute. The further inquiry is now presented, whether we can rightfully act in the matter; and the constitution having dedared that the justices of this court shall not hold any other office or public trust, I think we cannot accept this appointment, however willing we may be to give effect to the wishes of the legislature. If we can execute the office'of street commissioners for the city and county of New-York, the like powers may.be conferred upon us in relation to any other town or county in the state; or the duties of the office of comptroller, treasurer or sheriff may be assigned to- us; and thus the constitutional disqualification to hold any other office would be completely evaded. Following out the principles which have already been settled in relation to this law, I think it conflicts with the constitution, and cannot therefore be supported. And in this opinion I had the full concurrence of the late Mr. Justice Cowen.(a)
The act of 1813 made the assessment a lien upon the land, but gave no power to sell. By the second section of the act of 1816, [Stat. of 1816, p. 114,) it is provided, that whenever any assessment upon lands in the city of New-York shall not be collected, and the collector shall make affidavit of his demanding the money two several times of such owners as may reside in the city, and that they have neglected or refused to pay; or shall make affidavit that the owners cannot upon diligent enquiry be found in the city, then, and in any such case, it shall be lawful for the corporation to take order for advertising and sell *29 ing the land for a term of years : and the lease to be executed to the purchaser “ shall be conclusive evidence that the sale was regular according to the provisions of this act.” I take it to be entirely clear, as well upon the words of the statute as the reason of the thing; that the legislature did not intend to authorize a sale of the land except in cases where the prescribed affidavit should be made. There must be an unpaid assessment, and an affidavit of the collector. The latter is made just as necessary as the former, and we might as well dispense with the one as with the other. The corporation can take no order in reference to a sale—not even for advertising—until the affidavit has been made. It is familiar doctrine in relation to these statute sales, that it lies on the purchase!: to show a strict compliance with the statute. He must make out his case affirmatively, showing step by step the existence of all the facts on which the right to sell is made to depend. (Sharp v. Speir, 4 Hill 76, and cases cited.) Under this statute the lease is evidence of the regularity of the sale; but not of the right to sell. No affidavit was produced, though the.want of it was distinctly made a point upon the trial. This was a fatal objection to the defence which was set up under the corporation lease.
It is well known that men acting in a body, especially when under the cover of corporate privileges, will often do what no one of them would be willing to do if acting alone and upon his individual responsibility. And they will sometimes say aye, or permit a matter to pass sub silentio, when they would not venture to record their names in favor of the measure. To guard against such evils, and protect the citizens against the imposition of unnecessary burdens, it was provided by the seventh section of the amended charter, that the ayes and noes should be called and published whenever a vote of the common council should be taken on any proposed improvement involving a tax or assessment upon the citizens. (Stat. of 1830, p. 126.) The language is imperative—the ayes and noes shall be called. When the particular mode in which the corporation is to act is thus specially declared by its charter, I think it can only act in the prescribed form. The contrary doctrine wants the sanction *30 of legal authority, and is fraught with the most dangerous consequences. It would place corporations above the laws, and there is reason to fear that they would soon become an intolerable nuisance.
Judgment for the defendant.

 This question was before the court in the Matter of Thirty-Ninth street, and several other streets, on motions to confirm the reports of the commissioners of estimate and assessment, when Cowen, J. agreed with Bronson, J. that the statute was unconstitutional. A re-argument was subsequently ordered, and the matter was discussed in connection with the principal case of Striker v. Kelly.